605-07/GMV/PLS
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff Seafreezers S.A.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Pamela L. Schultz (PS 8675)



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEAFREEZERS S.A., | 07 cv _____ |
| Plaintiff | |
| - against - | **VERIFIED COMPLAINT** |
| FRITO LAY MANUFACTURING LIMITED, | |
| Defendant | |

Plaintiff SEAFREEZERS.A. ("SEAFREEZERS") by its attorneys Freehill, Hogan & Mahar, LLP, as and for its Verified Complaint against Defendant FRITO LAY MANUFACTURING LIMITED ("FRITO LAY"), alleges upon information and belief as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract of charter party. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331 in that the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2. At all times relevant hereto, Plaintiff SEAFREEZERS was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at IBC Tower, 9th Floor, Office No. 5, Manuel Espinosa Batista Avenue, Panama.

3. At all times relevant hereto, and upon information and belief, Defendant FRITO LAY was and still is a business entity duly organized and existing under the laws of a foreign country with an address at Paveletskaya Square, Building 2/2, 115054 Moscow, Russia.

4. On or about 5 March 2007, Plaintiff, as disponent owner of the M/V MAGELLANIC, entered into a maritime contract of charter party with Defendant FRITO LAY, on an amended Gencon form for carriage of a cargo of potatoes in jumbo bags. A copy of the charter party is attached hereto as **Exhibit A**.

5. Pursuant to the charter party, the cargo was loaded and demurrage was earned.

6. Despite due demand, CHARTERERS did not pay the demurrage timely and there remains due and owing to OWNERS the balance of $25,364.24.

7. Plaintiff SEAFREEZERS has fulfilled all obligations required of it under the charter party.

8. The charter party provides that it is to be governed by English law and that any disputes between the parties are to be resolved by arbitration in London

9. Arbitration proceedings have been commenced and are pending in London under the Small Claims Procedure, and SEAFREEZERS specifically reserves its right to arbitrate the substantive matters at issue.

10. This action is brought to obtain jurisdiction over FRITO LAY and to obtain security in favor of SEAFREEZERS in respect to its claims against FRITO LAY and in aid of London arbitration proceedings.

11. Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable.

12. This action is further brought to obtain security for any additional sums to cover Plaintiff's costs and fees in pursuing FRITO LAY in London arbitration, which under the Small Claims Procedure are fixed at GBP £4,375 (approximately $9,000) and accrued interest on the underlying claim in the amount of $2,549.08 at a rate of 7.5% p.a. until the entry of judgment or an arbitration award at the end of 2008.

13. Therefore, Plaintiff seeks an attachment pursuant to Rule B in the amount of USD $36,913.32.

14. Upon information and belief, and after investigation, Defendant FRITO LAY cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant in the amount of **$36,913.32** (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in its name or for its benefit at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

WHEREFORE, Plaintiff SEAFREEZERS prays:

a. That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendant, citing it to appear

and answer under oath all and singular the matters alleged, failing which a default will be taken against it;

b. That since Defendant cannot be found within this District pursuant to Supplemental Rule B, that all assets of Defendant up to and including the sum of $36,913.32 may be restrained and attached, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of Defendant including but not limited to such assets as may be held, received or transferred in its own name or for its benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c. That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and,

d. For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
December 5, 2007

_Pamela L. Schultz (PS 8675)_
FREEHILL HOGAN & MAHAR, LLP
80 Pine Street
New York, NY 10005
(212) 425-1900
Attorneys for Plaintiff

## ATTORNEY VERIFICATION

State of New York )
) ss.:
County of New York )

PAMELA L. SCHULTZ, being duly sworn, deposes and says as follows:

1. I am an associate with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2. The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by English solicitors representing our client.

3. The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Pamela L. Schultz

Sworn to before me this
5 day of December 2007

_____
Notary Public

MELISSA COLFORD
Commissioner of Deeds
City of New York-No. 5-1692
Certificate Filed in New York
Commission Expires 4/1/ 0&

10/05 2007 12:19 FAX                                                                                            ☒005

| 1. Shipbroker<br><br>Messrs. Sea Brotherhood Shipping Ltd., Cyprus c/o<br>Messrs. Sea Brothers Shipping Ltd., Russia | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)<br>(To be used for trades for which no specially approved form is in force)<br>CODE NAME: "GENCON"                    Part I |
|---|---|
| | 2. Place and date<br><br>St. Petersburg, March 05th 2007 |
| 3. Owners/Place of business (Cl.1)<br>Messrs. Seafreezers S.A., Panama, as disponent owners<br>IBC TOWER, 9TH FLOOR, OFFICE NO.6<br>MANUEL ESPINOSA BATISTA AVENUE<br>PANAMA, REPUBLIC OF PANAMA | 4. Charterers/Place of business (Cl.1)<br><br>Messrs. Frito Lay Manufacturing Limited, Russia |
| 5. Vessel's name (Cl.1)<br><br>m/v "Magellanic" | 6. GT/NT (Cl.1)<br><br>See clause 53 |
| 7. DWT all told on summer load line in metric tons (abt.) (Cl.1)<br>See clause 53 | 8. Present position (Cl.1)<br><br>Trading |
| 9. Expected ready to load (abt.) (Cl.1)<br>March 11th, 2007 | |
| 10. Loading port or place (Cl.1)<br><br>1 gsb aaaa Alexandria or Abu Qir in chopt, Egypt | 11. Discharging port or place (Cl.1)<br><br>1 gsb aaaa Novorossiysk, Russia |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo" (Cl.1)<br><br>Up to full and complete cargo of potatoes in Jumbo bags | |
| 13. Freight rate (also state whether freight prepaid or payable on delivery)(Cl. 4)<br><br>USD 217.500,- Lumpsum FIOS L/S/D 1-1<br>Also, see clause 47 | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4)<br><br>See clause 26 |
| 15. State if vessel's cargo handling gear shall not be used (Cl.5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl.6) |
| 17. Shippers/Place of business (Cl.6) | (a) Laytime for loading |
| 18. Agents (loading) (Cl.6)<br>Charterers' ship agents tbn | (b) Laytime for discharging |
| 19. Agents (discharging) (Cl.6)<br>Charterers' ship agents tbn | (c) Total laytime for loading and discharging<br>See clause 49 |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl.7)<br>USD 8.500,- per day pro rata/free dispatch at both ends<br>Also, see clause 42 | 21. Cancelling date (Cl.9)<br>16th of March, 2007 (23:59 local hours) |
| | 22. General Average to be adjusted at (Cl.12)<br>In London under English law |
| 23. Freight Tax (state if for the Owners' account (Cl.13 (c)) | 24. Brokerage commission and to whom payable (Cl.15)<br><br>4 pct ttl on freight, deadfreight, demurrage<br>including 1,5pct to Messrs. Sea Brotherhood Shipping Ltd. |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl.19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl.19)<br><br>English law to apply, 19 (a) | |
| (a) State maximum amount for small claims/shortened arbitration(Cl 19)<br>USD 50.000,00 | 26. Additional clauses covering special provisions, if agreed<br>Clauses from 20 to 55 are fully incorporated into this C/P |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature(Owners) | Signature (Charterers) |
|---|---|
| | |

Printed and sold by Fr.G. Knudtzon Ltd., 55 Toldbodgade, DK-1253 Copenhagen K, Telefax +453393 11 84
by authority of The Baltic and International Maritime Council (BIMCO), Copenhagen


EXHIBIT A

@006

PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

1. It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight Capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:
The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat, and there deliver the cargo.

2. Owners' Responsibility Clause
The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.
And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

3. Deviation Clause
The Vessel has liberty to call at any port or ports in any order, in any order, in case of emergency, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations emergency, and also to deviate for the purpose of saving life and/or property.

4. Payment of Freight (See clause 47)
(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.
(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost. Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.
(c) On delivery. If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally.
Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.

5. Loading/Discharging
(a) Costs/Risks
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.
(b) Cargo Handling Gear
Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party - shall not count as laytime or time on demurrage. On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed to be their servants but shall always work under the supervision of the Master.
(c) Stevedore Damage (See clause 35)
The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.
The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of the Charterers and shall be paid to the Owners by the Charterers at the demurrage rate.

6. Laytime (See clause 49)
*(a) Separate laytime for loading and discharging
The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
*(b) Total laytime for loading and discharging
The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
*(c) Commencement of laytime (loading and discharging)
Laytime for loading and discharging shall commence at 13.00 14:00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06:00 09:00 hours next working day if notice given during office hours after 12.00 hours. Notice of

readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.
If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime.
If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.
Time used before commencement of laytime shall not count.
* Indicate alternative (a) or (b) as agreed, in Box 16.

7. Demurrage (See Clause 42)
Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.
In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.

8. Lien Clause
The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

9. Cancelling Clause
(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.
(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.
Such option must be declared by the Charterers within 48 24 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.
The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.

10. Bills of Lading
Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the Owners' agents provided written authority has been given by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party.

11. Both-to-Blame Collision Clause
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

12. General Average and New Jason Clause
General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2).
If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery."

13. Taxes and Dues Clause
(a) On Vessel -The Owners shall pay all dues, charges and taxes customarily levied on the Vessel, howsoever the amount thereof may be assessed. D/As at both loading and discharging ports are to be as per the port tariffs and for the Owners' account.
(b) On cargo -The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed.
(c) On freight -Unless otherwise agreed in Box 23, taxes levied on the freight shall be for the Charterers' account.

☑ 007

PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

14. **Agency**
In every case the Owners shall appoint their own Agent both at the port of loading and the port of discharge.

15. **Brokerage**
A brokerage commission payable by the Owners at the rate stated in Box 24 on the freight, dead-freight, and demurrage earned is due to the party mentioned in Box 24.
In case of non-execution 1/3 of the brokerage on the estimated amount of freight to be paid by the party responsible for such non-execution to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be agreed.

16. **General Strike Clause**
(a) If there is a strike or lock-out affecting or preventing the actual loading of the cargo, or any part of it, when the Vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, the Master or the Owners may ask the Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless the Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, the Owners shall have the option of cancelling this Charter Party. If part cargo has already been loaded, the Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.
(b) If there is a strike or lock-out affecting or preventing the actual discharging of the cargo on or after the Vessel's arrival at or off port of discharge and same has not been settled within 48 hours, the Charterers shall have the option of keeping the Vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging until the strike or lock-out terminates and thereafter full demurrage shall be payable until the completion of discharging, or of ordering the Vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party and of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance to the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.
(c) Except for the obligations described above, neither the Charterers nor the Owners shall be responsible for the consequences of any strikes or lock-outs preventing or affecting the actual loading or discharging of the cargo.

17. **War Risks ("Voywar 1993")**
(1) For the purpose of this Clause, the words:
(a) The "Owners" shall include the shipowners, bareboat Charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.
(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.
(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.
(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(5) The Vessel shall have liberty:
(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;
(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;
(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
(d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;
(e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;
(f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.
(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

18. **General Ice Clause** The vessel is fitted for trading to the nominated port of discharging. Additional premium for breaking IWL, if any, to be for the Owners' acct.
Port of loading
~~(a) In the event of the loading port being inaccessible by reason of ice when the Vessel is ready to proceed from her last port or at any time during the voyage or on the Vessel's arrival or in case of frost setting in after the Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without cargo, and this Charter Party shall be null and void.~~
~~(b) If during loading the Master, for fear of the Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for the Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination at the Vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Charterers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per this Charter Party.~~
~~(c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or the Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the Charter Party null and void unless the Charterers agree to load full cargo at the open port.~~

Port of discharge
~~(a) Should ice prevent the Vessel from reaching port of discharge the Charterers shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying demurrage or of ordering the Vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the impossibility of reaching port of destination.~~
~~(b) If during discharging the Master for fear of the Vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge.~~
~~(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.~~

19. **Law and Arbitration**
*(a) This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall be final.
For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.
*(b) ~~This Charter Party shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, may be made a rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc. For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc.~~
*(c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place indicated in Box 25, subject to the procedures applicable there. The laws of the place indicated in Box 25 shall govern this Charter Party.
(d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply.
*(a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.
**Where no figure is supplied in Box 25 in Part I, this provision only shall be void but the other provisions of this Clause shall have full force and remain in effect.

18/05 2007 12:22 FAX                                                                                                     ⌀008

## Additional Clauses to the m/v "Magellanic"
## Charter Party dated St. Petersburg, March 05th, 2007

**Clause 20:** Charterers' agents at the port of loading and the port of discharging.

    Loading port:    to be nominated

    Discharging port:    to be nominated

**Clause 21:** Charterers/Shippers are to supply Owners/Master prior to loading with written instructions on the carriage and/or ventilation and/or refrigeration of the goods and on any other relevant aspects of the carriage thereof, having regard to the nature of the goods to be carried and to the equipment of the vessel as described herein. Owners to be indemnified by Charterers for any loss or damage to the goods or to the vessel as a result of such instructions.
Charterers to provide in writing to Owners and/or Master voyage instructions.
The vessel's logbooks including temperature of the cargo to be accessible to the Charterers.
In addition, Officers of the vessel to fill up the Charterers log abstract and other reports whenever required.
If any damage to the cargo has occurred, or suspected to have occurred, Owners and/or Master to allow Surveyors nominated by the Charterers or their insurance company to investigate the cause of the damage.
The surveyors to have free access to the cargo holds and all necessary documents.

**Clause 22:** Loading port notices: Master/Owners to give 5, 3, 2 and 1 days ETA to Agents and Charterers' broker SBS (general@seabrothers.spb.ru; cyril@seabrothers.spb.ru; nikolay@seabrothers.spb).
Discharging port notices: Immediately after completion of loading then every day prior to arrival at discharging port together with noon position and average speed to discharging port Agents and Charterers' broker.
Owners to keep Charterers/Agents closely informed about vessel's position.
Furthermore Master/Owners to forward to Charterers via their brokers every day noon position and ETA to discharge port as above together with a brief report stating:
1. Delivery air/Return air/Pulp temperature in each compartment,
2. Percentage of $CO_2$ in each compartment,
3. General conditions of cargo and if any smell of ripening.
Owners/Master to notify Charterers immediately in case of any damage to the cargo of whatever nature.
Vessel to perform voyage with utmost dispatch and maximum safe speed, weather permitting, using the shortest route to the discharging ports without interrupting the voyage except for bunkering and without deviation, if not in emergency, Charterers to be immediately informed in case of deviation and/or stoppage and/or engine trouble and/or any other cause which may delay the arrival more than 12 hours from the first ETA advised.
Soonest upon completion of discharge, Owners/Master and/or their Agents to fax to the Charterers Statement of Facts, Notice of Readiness and Time-Sheet of both loading and discharging ports.

NOR is to be tendered by the Master to Agents from pilot station of loading/discharging port at laycan during working hours.

**Clause 23:** Stowage at loading port to be supervised and approved by the Ship's Master.

**Clause 24:** Deleted.

**Clause 25:** Master not to sign Mate's Receipt and Bills of Lading for quantities which according to the best of his knowledge have not or seem to have not been loaded.
Mate's Receipt quantity to be conclusive evidence of quantity of pallets loaded on board.

**Clause 26:** Full freight payable after signing/releasing Bills of Lading marked "Freight payable as per Charter Party dd 05th March. 2007", but in any case before breaking bulk at port of discharging.
If "Freight Prepaid" Bills of Lading are required, same to be released immediately after Charterers irrevocable freight remittance.

Freight payable to Owners' bank details:
SEAFREEZERS S.A.
IBC TOWER
9TH FLOOR, OFFICE NO.6
MANUEL ESPINOSA BATISTA AVENUE
PANAMA
REPUBLIC OF PANAMA

m/v Magellanic Charter Party dd St.Petersburg, 05th March, 2007

ABN AMRO BANK
93, AKTI MIAOULI STR.,
PIRAEUS BRANCH
SWIFT:        ABNAGRAP
BENEFICIARY: SEAFREEZERS S.A.
ACCOUNT No. :095/000546127 USD
IBAN NO. :   GR 55 0601 0950 0000 0000 0546 127
REFERENCE :  MAGELLANIC/FRITO LAY

CORRESPONDING BANK IN NEW YORK – USA
ABN AMRO BANK
NEW YORK – USA
SWIFT CODE :         ABNAUS33
ABA No. :            026009580
CORRESPONDING ACCOUNT : 661001039141

Clause 27: Overtime to be for the account of the party ordering same.
If ordered by Port Authorities, overtime to be for Charterers' account but crew's and officers' overtime to be always for Owners' account.

Clause 28: Any taxes and/or dues on vessel/flag/crew to be for Owners' account.
Taxes on cargo or calculated on cargo to be for Charterers' account
All port dues/compulsory, if any, as per ports' tariffs to be always for Owners' account.
Disbursements in loading and discharging ports to be for Owners account.

Clause 29: Owners warrant that vessel is covered with a P&I Club for cargo claims and will remain so for the duration of this voyage.

Owners P&I Club: SCULD

Clause 30: It is mutually agreed that this contract is subject to the provisions of the Hague Rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading dated Brussels August 25, 1924 and/or Hague – Visby Rules and/or Hamburg Rules as may compulsory be applicable, then the terms of the Hague Visby Rules shall be deemed to be incorporated in the Bills of Lading. Congen Bills of Lading to be used.

Clause 31: New Both-to-Blame Collision Clause, P&I Bunkering Clause and General Paramount Clause are deemed to be incorporated in the Bills of Lading. Congen 1994 Bills of Lading to be used.BIMCO standard ISM Code and ISPS Clause for voyage Charter Parties of the last reduction. BIMCO standard Year 2000 Clause.

Clause 32: All Bills of Lading issued under this Charter Party shall be claused "All the terms, conditions, clauses and exceptions in the Charter Party dated 05th March, 2007, including Law and Arbitration Clause, are herewith incorporated in this Bill of Lading".

Clause 33: Deleted.

Clause 34: Vessel's cargo gear shall at all time be in good working order. In the event of a breakdown of a winch or winches by reason of disablement or insufficient power, the laytime to be counted pro rata for the period of inefficiency in relation to the number of winches available.

Clause 35: Master to sign Bills of Lading in accordance with Mate's receipts for quantity of pallets loaded. It is agreed that whenever there are disputes during loading operations on the quality and/or quantity of the cargo being loaded Master and Charterers' representatives to try to settle the disputes soonest and appointing surveyors if necessary in order to ascertain the quantity and/or quality of the cargo being loaded.
It is agreed that whenever there are no disputes during loading operations the goods are considered accepted "in apparent good order and condition" and any remarks on the Mate's Receipts or Bills of Lading made at the end of loading without having notified Charterers of any problem on the quantity during loading will not be acceptable.

Clause 36: The vessel's cargo compartments to be free of smell and clean prior to start loading to the satisfaction of Surveyors appointed by Charterers. If Charterers' surveyor is not satisfied, then independent surveyor should be agreed upon and appointed for survey for Owners' account if independent survey recognizes ship's unreadiness or for Charterers account if opposite.

m/v Magellanic Charter Party dd St.Petersburg, 05th March, 2007

In the event vessel's cargo compartments not being properly clean, odour-free and pre-cooled as per Charterers' instructions, vessel shall not be considered as ready to accept cargo and time not to count until the ship is accepted as ready in every respect for loading to independent surveyor satisfaction.

Clause 37: Owners warrant that vessel is suitable in all respects for the carriage of Citrus on pallets.
Charterers to have at disposal the full bale cubic capacity of the vessel.
Master shall confirm latest 24 hours prior to start loading that refrigerating plants are in good working condition and final ETA at loadport to be given 48-24 hours prior arrival.
The refrigerating plant must be able at all times to maintain simultaneously separate temperatures in each of her cooling insulated sections as required by the Charterers during the whole duration of the voyage.
The refrigerating plant and appliances shall upon tendering NOR in first loading port to be up to class requirements and to be maintained in that class for the whole duration of the voyage.
Owners to maintain all cooling devices in good working conditions during the whole period of this Charter at Owners' expenses and in case of breakdown and/or faults in same due to Owners' or their Managers' negligence or default, Charterers to claim to Owners for damages caused to cargo if any. Charterers' losses to be confirmed by relevant supporting documents.
In case of any default/trouble which can hinder/delay the normal loading operations, the Owners shall advise Charterers.
Owners confirm that the vessel is able to maintain delivery air temperatures in all cargo compartments of 0 / +8°C.

Clause 38: Charterers to have the right to place a Supercargo during loading and discharging operations. Owners providing him Officers' cabin accommodation. Charterers to have the right to embark a Supercargo also if they so wish, providing him Officers' cabin accommodation and Charterers to pay in such case to Owners USD 10 (ten USDollars) per day for victualling at Captain's table. Should the Charterers embark a Supercargo, it is understood that they are to relieve Owners from all responsibilities whatsoever for accident to such person whilst on board and that any claim whatsoever shall be settled by Charterers.

Clause 39: All cargo compartments to be equipped with distance thermometers to control the temperatures from the bridge or Engine Control Room or other suitable place.
The cargo compartments are also fitted with $CO_2$ detectors, if not fitted in vessel's holds, Owners to guarantee that suitable portable detectors are on board and that ship's staff will measure $CO_2$ content in the cargo compartments by this mean.
Delivery and return air together with pulp temperature shall be checked once per day.
Humidity also shall be checked whenever practicable.
Temperatures shall be recorded and supplied to Charterers together with other voyage reports, which may be required after receiving Owners written consent.

Clause 40: The vessel shall supply, when required during loading/discharging, electric light as onboard to Stevedores and always free of charge for the Charterers.

Clause 41: Any negotiations, discussions and fixture to be kept strictly private and confidential.

Clause 42: Demurrage:
Demurrage if any is payable within 15 days after receipt of Owners' demurrage invoice supported with NOR and SOF at load and/or discharge ports signed by the Agents and/or Master.

Clause 43: Basic war risk insurance to be for Owners' account. Any extra war risk insurance or crew bonuses to be paid by Charterers.

Clause 44: Hatch sealing clause:
Owners/Vessel to be responsible for the number of customary stuffed pallets loaded and not for boxes and/or bag. Owners have the option to seal the hatches upon completion of loading and the seal numbers to be recorded. Provided such seals are intact upon vessel's arrival at discharge port, Owners shall not be responsible for any shortage claims.

Clause 45: Deleted.

Clause 46: Charterers have the option that Bills of Lading to be issued by discharging port Agents in accordance with Mate's receipts and manifests on behalf of the Owners and/or Master, provided Owners receive Shippers written approval and Bills of Lading have not been issued or been destroyed at port of loading to the Owners' satisfaction and same will be faxed to the Owners for their approval prior signing/releasing.

Clause 47: Freight USD 217.500,- Lumpsum FIOS L/S/D 1-1 payable before braking bulk.

18/05 2007 12:24 FAX                                                                                           ☑011

m/v Magellanic Charter Party dd St.Petersburg, 05th March, 2007

| | |
|---|---|
| Clause 48: | Deleted. |
| Clause 49: | The cargo to be loaded/discharged within 5 (Five) total days all purposes per weather working day of 24 consecutive hours.<br>Time from Thursday 16:00 hrs/Friday/Saturdays and local Holidays are excluded till Sunday 09:00 hrs, even if used at ports of loading. Time from Friday 17:00 hrs/Saturday/Sunday and local Holidays are till Monday 09:00 hrs, even if used at port of discharging.<br>Shifting time from anchorage or waiting place/the ice edge to the berth and mooring not to count as laytime. Time lost in waiting for the ice breaker starts to count as laytime SHINC after 12 hours grace period. |
| Clause 50: | The vessel to be equipped with sideshorings. Master to provide ropes, airbags and slings as onboard the vessel free of charge to Charterers. All additional materials including slings to be for Charterers/Shippers account. |
| Clause 51: | Owners warrant that the vessel is fully gratings fitted, suitable for forklifts on rubber tires up to 5 (five) tons weight including cargo. |
| Clause 52: | Clean Bills of Lading to be issued. Master to reject any cargo which is not in condition to be inserted in Bill of Lading as 'clean'. |
| Clause 53: | Vessels description: |

| | |
|---|---|
| NAME: | MAGELLANIC |
| HEADOWNERS: | POWERFUL NAVIGATION S.A. PANAMA |
| BUILT: | FUKUOKA SHIPBUILDING Co, JAPAN -1989 |
| FLAG: | PANAMA |
| CALL SIGN: | 3EGS8 |
| CLASS: | NKK |
| P+I CLUB: | SCULD |
| IMO No: | 8814902 |
| PORT OF REGISTRY: | PANAMA |
| DWAT: | 5,053.17 on 7.114m draft |
| GRT/NRT INTL: | 4,579/ 2,156 |
| GRT/ NRT PANAMA: | 5,090.22 / 3,593.22 |
| GRT/ NRT SUEZ: | 4,766.59 / 3,766.89 |
| LOA: | 117.40 m |
| LBP: | 107.0 m |
| BREADTH: | 16.40 m |
| DEPTH: | 09.95 m |
| DRAFT SUMMER: | 07.114 m |
| HOLDS/HATCHES: | 4/4 (Hatch Size: LxB: 5.50 x 5.00M) |
| COMPARTMENTS: | 11 COMPARTMENTS |
| Hold No.1: | A, B |
| Hold No.2-4: | A, B, C |
| COOLING SECTIONS: | 7 COOLING SECTIONS |
| GRATINGS: | WOODEN- MAX LOAD 5MT (CARGO + FORKLIFT WITH 4 PNEUMATIC TYRES) |
| CARGO GEAR: | 8 Derricks (4 SETS - 3TNS SWL U/P) |
| REEFER PLUGS: | NIL |
| VENTILATION: | AXIALFLOW TYPE WITH 2 SPEEDS |
| AIR CIRCS: | FRUITS 90/60 PER HR, FZN 45 PER HOUR |
| AIR CHANGES PER HR: | BANANAS 4; FRUITS 2; FZN NIL |

CUBIC CAPACITY:

| | No.1 | No.2 | No.3 | No.4 | TOTALS |
|---|---|---|---|---|---|
| HATCH COAMINGS | 1,554 | 1,554 | 1,554 | 1,554 | 6,216 |
| A | 16,598 | 18,858 | 18,823 | 18,611 | 72,890 |
| B | 12,042 | 18,116 | 18,717 | 18,293 | 67,168 |
| C | - | 16,492 | 18,328 | 15,962 | 50,782 |
| TOTALS | 30,194 | 55,020 | 57,422 | 54,420 | 197,056 |

TOTAL: 197,056 CFT

DECK AREA (BY COMPT)

| | | |
|---|---|---|
| No. 1 | Hatch cover | - |
| | Cargo hold A | 171.13 |
| | Cargo hold B | 118.57 |
| | | 289.70 |

18/05 2007 12:24 FAX                                                                 ☒012

m/v Magellanic Charter Party dd St.Petersburg, 05th March. 2007

|  |  |  |  |
|---|---|---|---|
| No. 2 | Hatch cover | - | |
| | Cargo hold A | 226.05 | |
| | Cargo hold B | 213.78 | |
| | Cargo hold C | 171.45 | |
| | | 611.28 | |
| No. 3 | Hatch cover | - | |
| | Cargo hold A | 228.55 | |
| | Cargo hold B | 228.07 | |
| | Cargo hold C | 221.01 | |
| | | 677.63 | |
| No. 4 | Hatch cover | - | |
| | Cargo hold A | 226.83 | |
| | Cargo hold B | 214.31 | |
| | Cargo hold C | 164.59 | |
| | | 605.73 | |
| Grand Total | | 2,184.34 | |
| DECK HEIGHTS: | | MIN 2,20 m | |
| CARGO HOLDS TEMPS: | | No 1: | -32 C TO +32 C |
| | | No 2, 3, 4: | - 52 C TO +32 C |

Vessel is sideshoring fitted.

Clause 54: Charterers not to be responsible at force major circumstances, like war, ban for food products or act of god beyond the control of human being. In the event that force major should occur Charterers to inform Owners and vice versa.

Clause 55: All claims for damage alleged caused by the Stevedores to be settled directly between Owners and Stevedores at loading and discharging ports, such damage, if any, to be reported by the Master immediately upon occurrence of same or as soon as practically possible and Master has tried to obtain written acknowledgement of liability from the responsible party, but Charterers to remain ultimately responsible.
In case Owners fail to settle all claims within 15 days after notice to Charterers, Clause 5(c) of gencon 94 proforma to be considered in force.

******